UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 4:20-CR-40066-KES |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION |
| LARRY DEAN REDERICK, | |
| Defendant. | |

**INTRODUCTION**

Defendant Larry Dean Rederick is before the court on an indictment charging him with conspiracy to distribute 50 grams or more of methamphetamine (actual). See Docket No. 1. Mr. Rederick has filed a motion to suppress certain evidence. See Docket No. 42. The United States ("government") resists the motion. See Docket No. 48. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

**FACTS**

An evidentiary hearing was held on June 22, 2021. Mr. Rederick was there in person along with his lawyer, Mr. Robert Tiefenthaler. The government

was represented by its Special Assistant United States Attorney, Mr. Mark Hodges. Five witnesses testified and 10 exhibits were received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

In the spring of 2019 Special Agent Ryan Pennock with the South Dakota Division of Criminal Investigation ("DCI") was investigating Mr. Rederick for possible narcotics distribution. On May 28, 2019, Agent Pennock assisted in the interview of Brandi Jerome, who had just been arrested on drug charges. Jerome identified Mr. Rederick as a source of methamphetamine. Jerome had met Mr. Rederick through Brionna Eckman two weeks previous and in that time had received meth from him seven times.

During the two-week acquaintance, Jerome saw Mr. Rederick obtain one kilo of meth from near Irene, South Dakota. Jerome stated Mr. Rederick lived in a camper on his parents' farm. She described seeing Mr. Rederick store methamphetamine in a shaving kit in a black box inside this camper as well as in Mr. Rederick's shop. Jerome stated that Mr. Rederick told her he was "cartel." She also described seeing Mr. Rederick in possession of large amounts of currency.

Agent Pennock also helped interview Mary Mitchell on the same date. Ms. Mitchell had also just been arrested on drug charges. Mitchell described buying psilocybin mushrooms from Mr. Rederick as well as meth. Mitchell stated she did not pay Mr. Rederick money for these drugs but instead cleaned Mr. Rederick's vehicle in payment. Mitchell stated Mr. Rederick always had

2

meth on him.  She stated she bought meth from him several times.  She also observed frequent come-and-go traffic from Mr. Rederick's residence.  Mitchell related that Mr. Rederick told her he needed to "re-up" his drug supply at a location five hours away and that it was "hell."  Mitchell also met Mr. Rederick through Brionna Eckman.

In early October, 2019, Agent Pennock interviewed Brandon Wolff, who had also just been arrested on drug charges.  Wolff told Agent Pennock he was a meth distributor out of Norfolk, Nebraska, which is directly south of Yankton, South Dakota, on Highway 81.  Yankton is in the southeast corner of South Dakota.  Immediately before his arrest, Wolff stated he was negotiating with Mr. Rederick to sell him one pound of meth for $7,000.  The sale was not consummated due to Wolff's arrest.

Examination of Wolff's cellular phone revealed texts between Wolff and Mr. Rederick substantiating what Wolff told Agent Pennock.  The phone revealed there were prior drug transactions between Wolff and Mr. Rederick. On October 4, 2019, the day before Wolff's arrest, Wolff texted Mr. Rederick to say he had already made Mr. Rederick enough money.  Mr. Rederick responded he could make Wolff $800 per week.  Mr. Rederick stated he would do the transaction for $5,800 front, no push.  Agent Pennock testified that $5,800 was approximately the going price for a pound of meth at this time.

Other texts on Wolff's phone with another individual discussed that Mr. Rederick's drug prices were higher than Wolff's.  It appeared to Agent

Pennock that Wolff was attempting to take over Mr. Rederick's book of drug business.

Agent Pennock also interviewed Erick Walters in October 2019. Walters told Agent Pennock he had worked for Mr. Rederick as a mechanic (Mr. Rederick bought and sold cars as a business). Walters accurately stated that Mr. Rederick was living in a camper on his parents' farm. Walters said he saw Mr. Rederick smoking meth in the mechanic shop where Walters was working. He asked if he could have some, and Mr. Rederick began giving Walters meth, with Walters eventually paying for it.

Walters said in July 2019 he saw Mr. Rederick with ten pounds of meth which was stored in the toolbox of Mr. Rederick's white Ford pick-up. Walters identified the meth as originating in Kansas City. Walters stated Mr. Rederick went to the Omaha area to pick up these 10 pounds. Walters stated that Mr. Rederick would stop at the home of Steve Miller in Akron, Iowa, on his way back from supply trips to Omaha.

Walters told Agent Pennock he worked for Mr. Rederick until August 2019. He stated after he quit working for Mr. Rederick, he made three additional purchases of meth from him. Altogether, Walters estimated he bought meth from Mr. Rederick 10 to 15 times. He stated he had knowledge of multiple other persons who purchased drugs from Mr. Rederick.

On December 3, 2019, Agent Pennock interviewed a confidential informant ("CI") who had been working with the Yankton Police Department. The CI identified Mr. Rederick as a significant source of meth and the CI's own

source of meth. The CI indicated Mr. Rederick obtained his meth from the Omaha area and that Mr. Rederick had invited the CI to accompany him on his supply trips. The CI told Agent Pennock that Mr. Rederick lived in a camper on his parents' farm. The CI stated he had been to Mr. Rederick's residence multiple times and had seen large quantities of meth in the camper.

After the interview with the CI, Agent Pennock applied for and received a pen register/trap and trace order which allowed him to see what phone numbers Mr. Rederick was in contact with. Agent Pennock also received a warrant for cell site location information which would show in real time the approximate location of Mr. Rederick's phone. Agent Pennock received cell site information every 15 minutes or whenever Mr. Rederick made contact with another phone.

During Agent Pennock's surveillance of Mr. Rederick, he identified Lance Willits as one of Mr. Rederick's contacts. Further investigation revealed that Willits lived outside of Pierce, Nebraska. Pierce is north of Norfolk, Nebraska, and west of Highway 81.

A detective in Nebraska whom Agent Pennock contacted told Agent Pennock that Willits was a drug dealer with prior drug convictions. Agent Pennock reasoned Willits might be Mr. Rederick's source of supply for meth. Although Willits was approximately two hours away from Omaha, his residence was straight south of Yankton, South Dakota, on Highway 81 heading toward Omaha, Nebraska. Also, Pierce is near the town of Norfolk, and Agent Pennock knew that Mr. Rederick's prior source of supply, Brandon Wolff, had been

5

located in Norfolk.  Agent Pennock testified that Norfolk is a drug supply town for residents of in the southeast corner of South Dakota.

Sometime prior to January 3, 2020, Agent Pennock observed that Mr. Rederick traveled to Texas.  Agent Pennock testified that Texas is a source state for drugs.  When Mr. Rederick came back to South Dakota, Agent Pennock contacted the South Dakota Highway Patrol and asked them to follow Mr. Rederick's vehicle and stop him if they could develop independent probable cause for a traffic stop.  Mr. Rederick was stopped, and Trooper Cody Jansen had his drug detection dog, Rex, sniff Mr. Rederick's vehicle.  Rex indicated to the presence of the odor of drugs in the vehicle, but a subsequent search of the vehicle failed to locate any drugs.  Mr. Rederick was not arrested.

Subsequently on May 28, 2020, Agent Pennock interviewed Ricky Geidd. Geidd told Agent Pennock he lived within a mile of Mr. Rederick's camper. After the January 3, 2020, traffic stop, Mr. Rederick told Geidd that he had in fact had a user amount of meth with him at the traffic stop but the police had missed it when searching Mr. Rederick's vehicle.  Mr. Rederick also told Geidd that he had made a drug connection while he was in Texas.

Back on January 9, 2020, Agent Pennock was monitoring Mr. Rederick's location and saw that he had left his home and traveled to Yankton.  At this time, the pen register/trap and trace indicated Mr. Rederick was in contact with Willits.  Around 3:40 p.m., Mr. Rederick left Yankton and headed south into Nebraska on Highway 81.  Sometime after 4 p.m. Mr. Rederick arrived at Willits' residence near Pierce, Nebraska.

When Mr. Rederick arrived in the vicinity of Willits' home, electronic communication between the two ceased. Agent Pennock observed that Mr. Rederick's phone was north of Pierce in an area Agent Pennock believed to be consistent with Willits' address. Agent Pennock did not approach Willits' home because he knew from prior investigation there were outdoor surveillance cameras and he did not want to reveal his presence.

Agent Pennock contacted Nebraska police to see if they would be able to assist with a stop of Mr. Rederick's vehicle when he left Willits' home. Nebraska authorities were not able to assist Agent Pennock. Agent Pennock then contacted South Dakota Highway Patrol Troopers Eric Peterson and Cody Jansen, the K-9 officer who worked with Rex. Agent Pennock asked both troopers to be available near Yankton to make a stop of Mr. Rederick's vehicle when he crossed back into South Dakota. Agent Pennock explained to the troopers the background of his investigation of Mr. Rederick. He specifically told them that Mr. Rederick was at a location in Nebraska that Agent Pennock thought was his source of supply for meth. Agent Pennock asked the troopers to try to establish independent probable cause to stop Mr. Rederick, but to stop him in any event even if there was no traffic violation observed.

Agent Pennock explained that the reason for asking troopers to make a stop based on independent probable cause was so that his investigation would not be revealed to Mr. Rederick. If no drugs were found in Mr. Rederick's vehicle—as happened on January 3—Mr. Rederick would not learn of the

7

investigation of himself and Agent Pennock could continue pursuing further information and investigation without having "blown his cover."

Throughout the day, Agent Pennock updated Troopers Peterson and Jansen on Mr. Rederick's movements. At about 5:10 p.m. Mr. Rederick left Willits' house and went to Norfolk, arriving at 5:25 p.m. While in Norfolk, Mr. Rederick communicated three times with Willits electronically. At 7:05 p.m. Mr. Rederick drove back to Willits' home. At approximately 8 p.m. Agent Pennock saw Mr. Rederick drive by Jerry's Hilltop where Agent Pennock was sitting in his car observing. He observed Mr. Rederick to be driving north on Highway 81 in a white Ford pick-up towing a flatbed trailer behind with a red sedan on top of the trailer. This information was relayed to the troopers.

Because of all the information Agent Pennock had developed in his investigation of Mr. Rederick, he believed the trip to Willits' home was either for the purpose of picking up drugs or dropping off a payoff.

Trooper Peterson was waiting by the bridge on Highway 81 that crosses the Missouri River separating South Dakota from Nebraska at that location. When Mr. Rederick crossed into South Dakota, Trooper Peterson followed him as he turned onto Second Street and traveled east. As Mr. Rederick made this turn, Trooper Peterson observed that there was no illumination of the license plate on the trailer as required by South Dakota law. The license plate was not illuminated either by the taillights on the trailer or by an independent light. The license plate was located *behind* and off to the side of the trailer's taillights. Thus, the light emitted from the trailer's taillights shown backwards from the

8

trailer, while the license plate was located behind the taillights, closer to the pick-up and off to the left-hand side of the taillights.  This can clearly be seen in Exhibit 4, the dashcam video from Trooper Jansen's patrol car.  Although the trailer license plate can be seen in the dashcam video from Trooper Peterson's vehicle, it was dark out and Trooper Peterson's headlights from his patrol car were lighting up the license plate.

From Second Street, Mr. Rederick turned right onto Highway 50.  At this point, Trooper Peterson stopped Mr. Rederick by activating his lights and siren.  Trooper Peterson's dashcam video activated at this time.  See Exhibit 3.

Trooper Peterson made contact with Mr. Rederick, who was the only occupant in the pick-up at 1:31 into Exhibit 3.[1]  At 2:37 Mr. Rederick exited his pick-up and walked back to Trooper Peterson's patrol vehicle with him whereupon both men took a seat inside the car.  Trooper Peterson must have already told Mr. Rederick that he was being stopped for not having his trailer license plate illuminated.  While walking back to the patrol vehicle, Mr. Rederick bent over and examined the trailer license plate and Trooper Peterson stated, "you see what I mean?"

At five minutes into the stop, Mr. Rederick was already stating he wanted to get going.  Trooper Peterson explained he had to check out the registration for both the truck and the trailer and then he would get him going.  Trooper

---

[1] In their briefs, the parties reference the real time the events were occurring—i.e. 20:57 or 21:13.  In Exhibit 3, the real time of day is not imprinted or visible to the court, only the time elapsed on the video is available to the court.  Therefore, the description of events at the traffic stop are described using the elapsed time rather than the actual hour of the day.

Peterson noted that the license plate for the truck was a dealer plate and asked if Mr. Rederick had the VIN.[2]

Mr. Rederick apparently expressed frustration or agitation as Trooper Peterson asked, "what's wrong?"  Mr. Rederick stated he "dealt with you guys the other night over some bull---- too."  Mr. Rederick added "we'll see how this goes."

Trooper Peterson responded, "we'll see how what goes?"  Mr. Rederick stated, "you're giving me a warning."  Trooper Peterson asked, "you doing alright?"  Mr. Rederick responded in a sarcastic voice "oh yeah, I'm doing great."  He then added that he just wanted to go.  Trooper Peterson observed aloud that Mr. Rederick seemed extremely anxious to go.  Mr. Rederick stated again that he had been stopped a few nights previously and had not been doing anything wrong at that time.  At this point 6:31 had elapsed into the traffic stop.

Trooper Peterson stated aloud that Mr. Rederick seemed a little anxious. He noted Mr. Rederick's hands were shaking and was so anxious to get home. Mr. Rederick stated, "yeah, I just want to get home."  Trooper Peterson stated he would get the warning issued and get him on his way.  Trooper Peterson asked again if Mr. Rederick had the VIN for the pick-up.  Mr. Rederick did not, so Trooper Peterson said he would just go up and take a picture of the VIN

---

[2] Vehicle Identification Number.  A VIN is a unique 17-digit number assigned to each vehicle upon its manufacture.  Trooper Peterson explained that dealer license plates do not return the owner information so the status of a vehicle with dealer plates has to be verified by searching the database using the vehicle's VIN.

through the windshield. Trooper Peterson went to the front of the truck and immediately returned, explaining that there was something blocking the view. He asked if he could either move the obstruction or open the door to get the VIN off the door jamb.

Mr. Rederick told him to just get it off the door jamb. As Trooper Peterson walked back toward the truck, Mr. Rederick called out "Just the door!" as if he wanted to make sure the officer did not enter into the truck any further than looking at the door jamb. It was 9:09 when Trooper Peterson resumed his seat in the patrol car.

He asked Mr. Rederick about his trip to Norfolk (a subject the two had talked about earlier). Mr. Rederick asked him why he was asking so many questions. He then asked Trooper Peterson about his day. Trooper Peterson responded to the questions. Mr. Rederick expressed impatience. Trooper Peterson explained he was working on getting the warning prepared. He explained dealer plates do not return with registration information.

Trooper Peterson asked if Mr. Rederick had anything to be nervous about. Mr. Rederick gave a noncommittal answer. Trooper Peterson asked about his driver's license. There was silence for a time and Trooper Peterson can be heard working on a computer. He asked Mr. Rederick if he was doing okay. Mr. Rederick said he was just thinking about the tie-down strap that secured the red sedan to the trailer, seeing that it had broken.

Trooper Peterson stated he had all of Mr. Rederick's information now. At 11:45 Mr. Rederick exclaimed, "I don't know why you don't just let me go."

11

He claimed the police were harassing him.  At 12:03 Trooper Peterson told

Mr. Rederick he had a "couple of questions for him" because it "just didn't

quite seem right."  Mr. Rederick talks over the top of Trooper Peterson saying

"no, no, nope . . . Just give me my warning and let me go."  At 12:27

Mr. Rederick asked if he was being detained or arrested because he would like

to know that.

        Trooper Peterson stated he wasn't sure what he was getting at.

Mr. Rederick stated if he wasn't being arrested or detained, he wanted to go

home.  At this point, 12:49 into the video, Trooper Peterson called "125" and

asked him to "come over this way."  Presumably "125" is Trooper Jansen with

his K-9 Rex.  Trooper Peterson explained that Mr. Rederick was being detained

while he wrote out the warning ticket and asked him some questions.

Mr. Rederick replied that this traffic stop should take no longer than a normal

traffic stop and that if Trooper Peterson extended the stop longer than

necessary, "nothing after that can be [considered]."  Trooper Peterson stated it

was not taking any longer than normal.

        "Just fill out the report," Mr. Rederick stated.  "How long has this taken?"

he asked.  Trooper Peterson stated he was filling out the report; he explained

he had to get the VIN (and that prolonged the stop) and that he did not have

control over how fast the computer system worked.  Mr. Rederick lectured

Trooper Peterson on the law again and stated, "you're fine.  We're already past

it.  I know the law real well."  Trooper Peterson asked Mr. Rederick "what's the

law?"  At 15:18 Mr. Rederick asked Trooper Peterson for his card and then

asked, "are you done?"  Trooper Peterson stated he was "almost done."

 At 16:09 Trooper Peterson told Mr. Rederick he was proofreading the

ticket.  "Everything looks good."  Mr. Rederick then said "good" and asked if he

was free to go.  Trooper Peterson told him at 16:36 that he was done issuing

the warning ticket, but that Mr. Rederick was not free to go.  Mr. Rederick

asked why.  Trooper Peterson responded that he believed something else was

going on.  Mr. Rederick asked why he thought that.  Trooper Peterson replied

that Mr. Rederick was being detained on reasonable suspicion of "something."

Trooper Jansen contacted Trooper Peterson and indicated he was arriving

imminently.  Mr. Rederick kept asking why he was being detained and Trooper

Peterson explained he was waiting for a K-9 to arrive.  Mr. Rederick again

asked for the trooper's card and the card of the K-9 officer that was arriving.

He stated he did not have to answer the trooper's questions.

 The two then debated the law, with Mr. Rederick asserting the traffic stop

was taking longer than necessary to check out his license, insurance and

registration and Trooper Peterson asserting he had a reasonable articulable

suspicion to extend the stop.  "Why? Because I was irritated?" Mr. Rederick

asked.  Mr. Rederick threatened to get out of the patrol car and leave.  Trooper

Peterson explained he was being detained and if he tried to leave that would be

obstruction of an officer.  Mr. Rederick stated he did not want the K-9 and

made clear he was not giving permission for the K-9 to search.

At 22:21 Trooper Jansen arrived. Trooper Peterson asked him to have the vehicles sniffed. He explained to Trooper Jansen that Mr. Rederick had been constantly asking when he could leave, that he was highly agitated, that the ticket had taken longer than normal to write because he had to get the pick-up VIN, and that something "just wasn't right." Trooper Peterson told Trooper Jansen that Mr. Rederick denied consent to search and refused to answer any more questions.

Trooper Jansen and Rex had successfully completed a drug dog detection course consisting of 240 hours of coursework between September and early November 2019. During the schooling, the dogs are taught to detect the odor (not the physical presence) of various narcotics while the handlers are taught to read their dog and work with them as a team to effectively search. Handlers must learn what their dog's "alert" behavior is and become adept at recognizing it. Handlers must also teach their dogs a learned "indication" behavior.

An "alert" is an innate behavior a dog exhibits when sniffing something of interest to the dog. It can be a change in posture, a change in breathing patterns, a wagging of the tail, a head check (turning the head back toward the source of an odor) or any number of other behaviors. The alert is not taught— it is the dog's natural way of telegraphing that it is smelling something of interest.

The "indication" is a learned behavior that is taught. As the dog learns to recognize the smells it is being taught to find, it is taught to either sit, or lay

down, or some other easily-observed learned action to signify to the handler that the dog has located the scent.

Rex was taught to detect the odor of methamphetamine as well as five other controlled substances. Trooper Jansen explained that Rex's alert behavior consisted of breathing fast like an air compressor, wagging his tail faster than normal, adopting a more rigid body posture, and doing head checks. In any given search, Rex might exhibit one or more of these behaviors. Trooper Jansen testified Rex's alert behaviors are objectively observable if a person is there with Rex.

At the conclusion of the drug dog detection schooling, Rex and Trooper Jansen passed the certification testing and began work together. After initial certification, Rex and Trooper Jansen had to complete 16 hours of documented additional training every month. In addition, South Dakota is one of only four states in the nation that require certification of drug dog teams initially, and an annual recertification every year thereafter. Rex and Trooper Jansen's initial certification was introduced into evidence, as well as their training records, and their subsequent recertification in October 2020. See Exhibits 5, 6 and A. Rex was retired from active duty in January 2021, due to a back injury he sustained in the line of duty. Trooper Jansen testified that prior to January 9, 2020, Rex had never falsely alerted or indicated.

On the evening of January 9, 2020, Trooper Jansen first walked around the pick-up and trailer by himself and then he and Rex made two circuits around Mr. Rederick's pick-up and trailer together. The first pass Trooper

15

Jansen let Rex have a "free pass," and the second time Trooper Jansen directed Rex where to sniff.  Dashcam videos from Trooper Jansen's and Trooper Peterson's patrol cars show partial views of Rex's passes around the pick-up and trailer, but neither video shows the entirety of that action.  Trooper Jansen testified that on both passes around Mr. Rederick's pick-up and trailer, Rex alerted to the driver's side door of the pick-up.  On the second pass around, Rex alerted to the trunk of the car on top of the trailer (a red Chevrolet sedan) and to the passenger's side door on the pick-up.  After making the second pass around the vehicles, Rex indicated by sitting down near the passenger's side door of the pick-up.  Trooper Jansen put Rex back into his patrol vehicle and then notified Trooper Peterson at 27:25 that Rex had indicated.

Trooper Jansen testified that the alert behavior he witnessed from Rex as to the trunk of the red sedan was that Rex exhibited the breathing change and the speedier tail wag.

Following Rex's alerts and indication, Trooper Peterson told Mr. Rederick he was going to search and asked if Trooper Peterson would find anything. Mr. Rederick denied that there was anything in the pick-up and stated the car was not registered to him.  He asked again if he could leave.  Trooper Peterson said he was not free to leave then he searched Mr. Rederick's pick-up.  No drugs were found.  The red sedan on top of the trailer was searched next and five zip-lock baggies were discovered.  Two of the baggies were empty, and the other three contained a whitish crystal-like substance that later proved to be methamphetamine weighing .89 pounds or just under one pound.

16

Trooper Jansen notified Agent Pennock of their roadside findings.  Agent Pennock then drafted affidavits and applications for search warrants for Mr. Rederick's home and outbuildings, his person, and his cellular phone.  A state court judge issued the warrants.  See Exhibits 1 and 2.

Mr. Rederick called Dr. Mary Cablk to testify.  See Exhibit C (Dr. Cablk's curriculum vitae).  Dr. Cablk testified that the South Dakota Highway Patrol's dog training manual, Exhibit B, was based on the Utah Peace Officer Standards and Training (POST) training method which was designed in the 1990s.  She opined that the Utah POST training program does not produce reliable results, that it does not use double-blind testing, and the dog psychology on which it is based is outmoded.  Dr. Cablk conceded that there is currently no nationally-accepted standard for training drug detection dogs.  Dr. Cablk admitted that other jurisdictions besides South Dakota use the Utah POST method of training—specifically Colorado and Ohio.

Dr. Cablk also reviewed Rex's certification and training records.  She testified the records were confusing and she was not sure what they meant.  She testified no one had reviewed the training records.  She criticized training Rex with objects which had residual drug smell on them as opposed to training him using actual narcotics themselves.  She testified there was no evidence Rex was subjected to any blind or double-blind testing.  Blind testing is where neither the dog nor the handler know if any drugs are hidden in a search scenario and, if so, where they are.  Double-blind testing is where no one in the room including the judge knows if or where any drugs are hidden.  She also

17

testified she did not find evidence that Rex had been tested in scenarios where no drugs were hidden.

Ultimately, as to Rex, Dr. Cablk could not opine that he was either reliable or unreliable based on her review of the records. She watched video of Rex's circuit around Mr. Rederick's pick-up and trailer from the night of January 9, 2020. This video only showed a portion of Rex's behavior primarily from the driver's side and rear vantage point. She opined she could not detect additional or more vigorous tail wagging from Rex when he sniffed the trunk of the red sedan. Dr. Cablk has never trained any drug detection K-9 teams herself.

Lt. Christopher Koltz also testified. He is the supervisor for all K-9 teams in the South Dakota Highway Patrol, has been a K-9 handler since 1999, and runs the South Dakota Highway Patrol's certification schooling and testing. He explained that Dr. Cablk's testimony interpreting Rex's certification and training forms was in error. Rex *had* been subject to blind testing, but the forms used at the time called it "unknown" instead of using the term "blind." For example, Lt. Koltz testified when a K-9 and their handler perform searches in the seven scenarios required for certification, the handler has no idea whether any drugs are hidden and, if so, what the drugs are and where they are. Both Lt. Koltz and Trooper Jansen testified that Rex's training included exercises where drugs were actually hidden and some scenarios where there were no drugs hidden.

18

Although Lt. Koltz conceded the highway patrol has not used double-blind testing (where even the judge has no idea if there are drugs hidden), he testified it does not matter for the dog's reliability.  Since alert behavior is an innate behavior, neither a handler nor the judge can cue this untrained behavior.  Thus, if the judge knows where drugs are hidden, this does not cue the dog's alert behavior because the alert behavior is not learned.

Lt. Koltz testified that he does not strictly follow the South Dakota Highway Patrol manual when conducting training or certification.  He views the manual as a guide only and conceded that parts of it may need to be updated. For example, the manual says a dog should never be "cheated" in training. "Cheating" is the process of pretending to reward a dog for searching well, but actually not giving the dog a tangible reward.  Lt. Koltz testified this admonition from the manual is not followed.  He explained that, during testing, cheating the dog is required as handlers are not allowed to give the dogs tangible rewards.  If one doesn't acclimate the dog to cheating during training, it may become very frustrated during the certification process where it must search in seven scenarios and be cheated every time.  Lt. Koltz testified it would do a disservice to the dog not to train it using cheats randomly so that on "test day" receiving cheats instead of real rewards would not be a novel circumstance.

Lt. Koltz has traveled the United States extensively and is familiar with other training methods used for police dogs in other jurisdictions.  He testified the Utah POST method or protocol is used in 13 other states.  He testified the program of training and certification in South Dakota produces reliable results

19

and is comparable to results obtained by other states.  He testified South Dakota is one of only four states that require certification of K-9 teams and annual mandatory recertification.

Regarding Rex's training records, Lt. Koltz testified he reviewed all the work Rex and Trooper Jansen did, but that he just did not fill out the "reviewed by" box on the training form.

Mr. Rederick now moves to suppress his statements from the traffic stop, the evidence obtained from the traffic stop, and the evidence obtained by executing the search warrants.  He argues the traffic stop was not supported by either probable cause or reasonable suspicion and that the stop was unconstitutionally delayed in order to bring a drug dog to the scene. Mr. Rederick challenges the reliability and accuracy of Rex as well as challenging whether Rex alerted or indicted.  To the extent Rex indicated only to Mr. Rederick's pick-up and not the red sedan, Mr. Rederick argues that Rex's indication cannot provide probable cause for searching the red sedan, but only gave rise to probable cause to search his pick-up.  Finally, Mr. Rederick argues the subsequent search warrants were fruit of the poisonous tree of the Fourth Amendment violation which occurred at the traffic stop.  The government resists all of these arguments.

## DISCUSSION

### A.    Whether the Traffic Stop of Mr. Rederick Was Legal

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.  When a law enforcement officer stops a

motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." Brendlin v. California, 551 U.S. 249, 255-56 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)); United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001). A stop results in a seizure under the Fourth Amendment of all occupants of the vehicle, driver and passengers. Brendlin, 551 U.S. at 255-56. A traffic stop may be lawfully made under two circumstances. If there is probable cause to stop the vehicle, such a stop is lawful. United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting Untied States v. Coney, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002))). Also, if there is reasonable suspicion to stop the vehicle, the stop complies with the Fourth Amendment. Navarette v. California, 572 U.S. 393, 396-97 (2014); United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999).

### 1. Trooper Peterson Had Probable Cause for the Stop

Probable cause exists where the totality of the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed a crime. There need only be a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity. United States v. Torres-Lona, 491 F.3d 750, 755-56 (8th Cir. 2007). There must be evidence which would "warrant a man of reasonable caution in the belief" that a crime has been committed. Wong Sun v. United States, 371 U.S. 471, 479

(1963).  Trooper Peterson testified he effectuated the stop of Mr. Rederick

because the license plate on his trailer was not properly illuminated as

required by South Dakota law.

South Dakota state law requires that the license plate ("registration

plate" in the words of the statute) of a vehicle shall be illuminated by a white

light near the plate that renders it clearly legible from a distance of 50 feet to

the rear.  See SDCL § 32-17-11.[3]  The white light illuminating the license plate

must come on at any time whenever the headlamps of the vehicle are activated.

Id.  The white light can be a separate light dedicated to illuminating the license

plate, or it can be a white light that is part of the taillights required by SDCL

§ 32-17-8.  Id.

South Dakota Codified Law § 32-17-8 requires motor vehicles or a vehicle

or trailer being drawn at the end of a combination of vehicles to have at least

two tail lamps mounted on the rear which emit a red light plainly visible from a

distance of 1,000 feet to the rear.  SDCL § 32-17-8.  If there is a combination of

vehicles, only the rearmost vehicle in the string needs to have taillights meeting

this specification.  Id.

---

[3] SDCL § 32-17-11 reads in full as follows:

Either the rear lamps required by § 32-17-8 or a separate lamp shall be so
constructed and placed as to illuminate with a white light the rear registration
plate and render it clearly legible from a distance of fifty feet to the rear.  If the
rear registration plate is illuminated by an electric lamp other than the
required rear lamps, the lamps shall be turned on or off only by the same
control switch at all times whenever headlamps are lighted.

Mr. Rederick asserts two arguments with regard to the above statutes. One, as a matter of law, he argues the red taillights on a trailer can suffice to illuminate a license plate on a trailer being towed. Second, as a matter of fact, he argues the red taillights on his trailer on January 9, 2020, illuminated his license plate for a distance of 50 feet behind his trailer. In the court's estimation, he is wrong on both counts.

First, as to the legal argument, SDCL § 32-17-11 clearly requires a *white* light to illuminate the license plate. That white light can come from a separate light dedicated to illuminating the license plate or it can come from the taillights. There are taillights which emit red as well as white light, with the white light on the inside of the lamp closest to the license plate. In either event, it is clear the statute requires a white light for illuminating the license plate.

Second, even if Mr. Rederick's legal argument is credited that a red taillight can suffice to illuminate a license plate on a trailer, the red taillights on Mr. Rederick's trailer *did not* illuminate the trailer's license plate. The court makes this factual finding based on Trooper Peterson's testimony to that effect *and* on the dashcam video from Trooper Jansen's patrol vehicle. Trooper Peterson described the license plate on the trailer as being mounted *behind* and off to the left of the taillights on the trailer so that the red light emitted from the taillights began at a point in front of the license plate and showed away from the license plate. The dashcam video confirms this description. See Exhibit 4. The light from the taillights would have to have shined *backward*

23

(i.e. toward the pick-up instead of toward oncoming traffic) and to the left in order to illuminate the trailer's license plate. The taillights did not do so.[4]

Based on the court's reading of the South Dakota statutes and its factual findings, the court concludes that Trooper Peterson had probable cause to stop Mr. Rederick's vehicle on January 9, 2020, for failing to have the license plate on his trailer properly illuminated. United States v. Pena-Ponce, 588 F.3d 579, 583 (8th Cir. 2009) (stating that "[a]n officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot") (citation omitted). As such, the stop did not run afoul of Mr. Rederick's Fourth Amendment rights.

### 2. Trooper Peterson Had Reasonable Suspicion That Mr. Rederick Was Involved in Illegal Drug Trafficking

An alternate justification for a traffic stop is reasonable suspicion. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). Here, aside from the traffic violation discussed above, Trooper Peterson had a reasonable suspicion that Mr. Rederick was involved in drug trafficking.

An officer making a traffic stop based upon "reasonable suspicion" "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted). Instead, police must have "a 'particularized and objective

---

[4] The court finds it telling that Mr. Rederick, who argued with Trooper Peterson about nearly everything during the January 9, 2020, traffic stop, never suggested that his license plate on his trailer actually *was* properly illuminated.

basis for suspecting the particular person stopped of criminal activity.' "
Navarette, 572 U.S. at 396 (citation omitted).

"Reasonable suspicion" in support of a traffic stop "is dependent upon
both the content of information possessed by police and its degree of
reliability." Id. at 397 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).
In evaluating the standard, courts must take into account "the whole picture,"
the "totality of the circumstances." Id. A mere "hunch" does not suffice, but
the standard requires "considerably less than proof of wrongdoing by a
preponderance of the evidence" or probable cause. Id. (quoting Sokolow, 490
U.S. at 7). A traffic stop need not be based on the police officer's personal
observation—it can be based on information supplied by a third party. Id.
Even a single anonymous tip may provide the necessary reasonable suspicion if
the indicia of reliability are sufficient—such as richness of detail, eyewitness
observation, use of the 911 system to report the tip, and an absence of any
reason to suspect the tipster had a motive to fabricate. Id. "When a team of
law enforcement officers is involved in an investigation, the issue is whether all
the information known to the team provided 'specific and articulable facts
which, taken together with rational inferences from those facts, reasonably
warrant' the investigative stop." United States v. Collins, 883 F.3d 1029, 1032
(8th Cir. 2018) (quoting United States v. Winters, 491 F.3d 918, 921 (8th Cir.
2007)).

"[T]he constitutional reasonableness of a traffic stop does not depend on
the actual motivations of the officer involved, and the subjective intentions of

the officer making the stop are irrelevant in determining the validity of the

stop." United States v. Herrera-Gonzalez, 474 F.3d 1105, 1109 (8th Cir. 2007).

See also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (per

curiam) ("[T]he fourth amendment is not violated if an objectively good reason

for a traffic stop exists, whatever the actual subjective motive of the officer

making the stop may have been."). Although a traffic violation can provide the

basis for a traffic stop, there is no requirement that a traffic violation occur if

there are other grounds providing the officer with a reasonable, articulable

suspicion of criminal activity. United States v. Jacobsen, 391 F.3d 904,

906-07 (8th Cir. 2004) (quoting United States v. Mora-Higuera, 269 F.3d 905,

909 (8th Cir. 2001)).

Here, Agent Pennock had a wealth of information from multiple sources

each of which corroborated the other. Five separate people had independently

indicated that they purchased drugs from Mr. Rederick or, in the case of

Brandon Wolff, supplied drugs to him. These disclosures were against each of

the informant's penal interests as the disclosures implicated not only

Mr. Rederick but themselves as well. United States v. Leppert, 408 F.3d 1039,

1042 (8th Cir. 2005) (an informant's admissions against their own penal

interest are presumptively credible). Each person separately and accurately

described Mr. Rederick's living quarters. Cell phone data corroborated

Brandon Wolff's account of drug transactions and negotiations with

Mr. Rederick. United States v. Nieman, 520 F.3d 834, 839-40 (8th Cir. 2008);

United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998) (informants are

26

reliable where they give specific details that are partially or wholly corroborated by other informants). Finally, each informant's information was based on their own personal observations of Mr. Rederick, his possession of drugs, and his statements.  United States v. Stevens, 530 F.3d 714, 718-19 (8th Cir. 2008) (informant information is reliable when based on personal observations).

Agent Pennock had learned that Mr. Rederick's source of drugs was in the Omaha area, that Mr. Rederick's immediate past supplier (Wolff) was from Norfolk, and that in the wake of Wolff's arrest, Mr. Rederick began having contact with Lance Willits, someone who lived near Norfolk, was believed to be currently involved in drug trafficking, and who had prior drug convictions.

On January 9, 2020, Agent Pennock knew that Mr. Rederick was in communication with Willits, that he traveled to the immediate area of Willits' residence, left and hung out in Norfolk for a while, then went back to Willits' residence where he stayed a relatively short amount of time before leaving and traveling back to South Dakota.

Agent Pennock relayed much of this information in summary fashion to both Trooper Peterson and Trooper Jansen.  In particular, Agent Pennock gave the troopers play-by-play updates on Mr. Rederick's movements and with whom he was communicating on the day in question.  The information was from a reliable source (a DCI investigator).  The content of the information known to police as well as its reliability were both high.  Navarette, 572 U.S. at 397.  The Fourth Amendment does not require that Trooper Peterson had personal observation of the facts, just that the facts supplied by another were

reliable.  Id.  Under the totality of these circumstances, the court has little trouble concluding that Trooper Peterson had reasonable suspicion to stop Mr. Rederick on suspicion of drug trafficking activity.

**B.    Whether the Traffic Stop Was Illegally Prolonged**

Mr. Rederick argues that, even if Trooper Peterson's initial stop of him was constitutional, Trooper Peterson violated Mr. Rederick's Fourth Amendment rights by unduly prolonging the traffic stop.  "For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest.  Berkemer v. McCarty, 468 U.S. 420, 439 . . . (1984).  As such, a traffic stop is governed by the principles of Terry v. Ohio, 392 U.S. 1 . . . (1968)."  Jones, 269 F.3d at 924.

The constitutional analysis under Terry is two-part: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.  Thus, a traffic stop that is "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes . . . interests protected by the Fourth Amendment[.]"  United States v. Jacobsen, 466 U.S. 109, 124 (1984).  The court has already concluded Trooper Peterson's actions at the inception of the traffic stop were justified.  It now turns to the question whether the length of the traffic stop was also justified.

"Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic

violation that warranted the stop, [Illinois v. Caballes, 543 U.S. 405, 407 (2005)], and attend to related safety concerns[.]" Rodriguez v. United States, 575 U.S. 348, 354 (2015). See also Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Caballes, 543 U.S. at 407. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354.

"Beyond determining whether to issue a traffic ticket, an officer's mission [during a traffic stop typically] includes . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Rodriguez, 575 U.S. at 355. See also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (finding other inquiries incident to a traffic stop may include "inquiring about the occupants' destination, route, and purpose" (quotation omitted)). "When complications arise 'in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer

29

duration than when a stop is strictly routine.' " United States v. Soderman,

983 F.3d 369, 374 (8th Cir. 2020) (quoting United States v. Olivera-Mendez,

484 F.3d 505, 510 (8th Cir. 2007)).

Absent further reasonable suspicion, an officer may not conduct

unrelated checks that extend the stop beyond the time reasonably required to

complete its original mission. Rodriguez, 575 U.S. at 354-55. Yet, an officer

may lawfully engage in unrelated inquires so long as they do not measurably

extend the duration of the stop. Id. at 355. The Supreme Court in Rodriguez

found that a dog sniff is not an ordinary inquiry incident to a traffic stop and,

"by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal

wrongdoing." Id. (quoting Indianapolis v. Edmond, 531 U.S. 32, 40-41 (2000)).

"[A] dog sniff is not fairly characterized as part of the officer's traffic mission."

Rodriguez, 575 U.S. at 356.

Here, the key question initially is:  what was the purpose of the stop?  If

the purpose of the stop was to issue a warning ticket for failing to have a

license plate properly illuminated, the length of the stop must be fairly

abbreviated before running afoul of the Fourth Amendment.  It is the warning-

ticket measuring stick Mr. Rederick argues should be used to determine if

Trooper Peterson violated his Fourth Amendment rights.

But the government argues the purpose of the stop was to further Agent

Pennock's investigation into Mr. Rederick's suspected drug trafficking.  Using

this measuring stick, the government argues the permissible duration of the

stop under the Fourth Amendment is much longer than the mere issuance of a

traffic ticket. The government cites a case decided in January of this year in support of its position: <u>United States v. Magallon</u>, 984 F.3d 1263 (8th Cir. 2021).

In <u>Magallon</u>, officers stopped a vehicle in which three men were occupants, believing that one or more of them was involved in methamphetamine trafficking in Des Moines, Iowa. <u>Id.</u> at 1272-74. Officers separated the three men and questioned them separately, one at a time, with Garcia being questioned last. <u>Id.</u> Garcia sat handcuffed in the back of a patrol car for over an hour before police came to question him. <u>Id.</u> Eventually, Garcia gave consent to search his nearby car and methamphetamine was found therein. <u>Id.</u> Garcia moved to suppress the search of his nearby car, arguing that the officers unduly delayed the traffic stop in violation of the Fourth Amendment. <u>Id.</u> at 1278.

The court noted that a police stop cannot exceed the time needed to handle the matter for which the stop was made. <u>Id.</u> But the duration of a stop is directly related to the "mission" of the stop with the only requirement being that officers must act "reasonably diligent[ly]" in carrying out their mission. <u>Id.</u> Once an officer's "reasonable suspicion or probable cause dissipates, the stop must also cease." <u>Id.</u>

In <u>Magallon</u>, the Eighth Circuit defined the mission of the stop as "to investigate the GMC Sierra and its passengers' involvement with drug trafficking." <u>Id.</u> at 1279. Since that mission was ongoing for the duration of the traffic stop, and since "addressing the suspicion of drug activity required

31

time," the duration of the stop did not violate Garcia's Fourth Amendment rights.  Id.  Reasonable suspicion of drug trafficking remained extant for the entire duration of the stop and the officers worked diligently in pursing the investigation of their suspicions.  Id.

So, too, here.  The purpose of the stop was to investigate Mr. Rederick for drug trafficking.  This is evident in Agent Pennock's instructions to the troopers to stop Mr. Rederick in any event, even if they observed no independent probable cause arising from a traffic violation.  The development of an independent reason for the stop was merely a precaution to avoid having to reveal the drug investigation should a search reveal no evidence of wrongdoing.

Given the mission of the search—investigating Mr. Rederick for possible drug trafficking--all the officers involved acted diligently.  Agent Pennock arranged to have Trooper Peterson and Trooper Jansen standing by.  Trooper Peterson first obtained the VIN from the pick-up at 9:09 and finished writing the warning ticket only seven minutes later.  Trooper Peterson contacted Trooper Jansen to bring Rex promptly—12:49 minutes after the stop was initiated and even before he had finished issuing the warning ticket.  Trooper Jansen arrived at 22:21.  At 27:25 Trooper Jansen notified Trooper Peterson that Rex had indicated to the presence of drugs.  Only 27 and a half minutes elapsed from start of the traffic stop until Rex finished his sniff.  This is far less than the hour-plus duration of the drug investigative stop in Magallon.

In addition, the reasonable suspicion did not dissipate as the troopers were conducting their investigation.  Mr. Rederick showed abnormal signs of

agitation and nervousness.  Almost immediately he began asking then demanding to leave.  Rex alerted and indicated to the presence of the odor of drugs.  There was never a point in time during the 27 minutes that elapsed where one could say the troopers' reasonable suspicions were allayed.  The court concludes, given the drug investigation mission of the stop, that the duration of the stop did not violate Mr. Rederick's Fourth Amendment rights.

**C.    Whether Rex Provided Probable Cause for the Search**

   **1.    Whether Rex Is Reliable and Whether He Alerted**

Mr. Rederick argues that Rex is not reliable and that he did not alert to the red sedan.  Furthermore, he argues that although Rex may have alerted and indicated to the pick-up, that did not provide probable cause to search the red sedan on the flatbed trailer being towed behind the pick-up.

In Florida v. Harris, 568 U.S. 237, 245-46 (2013), the Supreme Court held an alert of a drug dog to a vehicle during a traffic stop may provide probable cause to search the vehicle *if* the drug dog is reliable and the alert is reliable under the circumstances.  In determining whether the drug dog is reliable and whether its alert was reliable under the circumstances, courts should not apply an "inflexible" set of rigid requirements in every case, but instead should consider relevant facts under the circumstances.  Id. at 244-45. Such factors to consider may include "evidence of a dog's satisfactory performance in a certification or training program," whether the dog "has recently and successfully completed a training program that evaluated his

proficiency in locating drugs," and "evidence of the dog's (or handler's) history in the field . . . may sometimes be relevant."  Id. at 246-47.

Even if the dog is shown to be generally reliable, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions."  Id. at 247.  "The question . . . is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  Id. at 248.

Here, the court pauses for an aside.  Justice Kagan wrote for a unanimous Court in Harris that a generally reliable drug dog which alerts under circumstances indicating the alert is reliable provides probable cause for a search.  Id. at 245-46.  But the record in this case is replete with evidence that Rex alerts **not** to the presence of actual drugs, but to the **odor** of drugs.  If this were a fact that escaped the notice of the Harris Court, there might be room for this court to distinguish the Harris holding from this case.

However, the Harris opinion is replete with references to the fact that Aldo, the dog in that case, alerted only to the **odor** of drugs, just like Rex.  See, e.g., Harris, 568 U.S. at 248.  But here is the nuance this fact raises that the Harris Court failed to acknowledge or discuss:  If a dog is trained to indicate only to the odor of contraband, how can one conclude that an indication means the contraband itself is more probably than not present in that location?  After all, it is not a crime to have the **odor** of contraband in one's car and finding

34

such an odor does not result in police obtaining evidence of a crime. Instead, it is only the possession of the **contraband itself** that gives rise to a crime and evidence of a crime. The Fourth Amendment requires probable cause of **evidence of a crime**. There are myriad ways the *odor* of a drug may be present in a vehicle without the actual contraband drug being present, such as contaminated money in general circulation, a car that has been driven by someone previously who had drugs in the car, etc.

However, this court is at "the bottom of the totem pole" in the federal judiciary. It is bound to follow decisions of courts above it. The Supreme Court has held that a reliable drug dog alert indicating the presence of the **odor** of drugs gives rise to probable cause for a search of the place indicated. This court is bound by that holding, even if it appears an oversimplification of the analysis.

The court turns, then, to the question whether Rex is reliable, whether he indicated or alerted to Ms. Rederick's vehicle on January 9, 2020, and, finally, whether that indication or alert was reliable. The court finds Rex to be reliable generally. He successfully completed the 240-hour training school in September through early November 2019, and successfully completed the seven separate testing scenarios necessary to be certified in November 2019. See Exhibit 5.

Mr. Rederick's expert, Dr. Cablk, never examined Rex or tested him. Her ultimate opinion was that she could *not* opine whether Rex was reliable or unreliable. Dr. Cablk essentially found the records to be unavailing, in part

35

because she did not know how to interpret them. For example, she asserted
that testing should include blind and double-blind tests. Because the records
did not use those terms, she stated she could not tell whether Rex had been
tested in this manner. But Lt. Koltz testified that an "unknown" test is the
same as "blind" test—the handler is unaware of whether there are any drugs
hidden in a scenario or, if so, where. Thus, Rex was tested using the "blind"
method, Dr. Cablk was simply unable to ascertain this from reading the
records because they did not use this term of art.

Dr. Cablk also took issue with the Utah POST method of training, on
which the South Dakota dog training manual draws heavily. But, again, she
did not opine that a dog trained under the Utah POST method was unreliable
nor did she opine that Rex specifically was unreliable.

Dr. Cablk took issue with the concept that a dog displaying innate alert
behavior is indicative of the presence of drug odor. She explained that dogs
display alert behavior in all manner of circumstances. But, again, she did not
opine that Rex was unreliable when his handler observed him displaying alert
behavior.

Dr. Cablk opined that Rex was not displaying faster-than-normal tail
wagging when he sniffed the trunk of the red sedan in the dashcam video.
Dr. Cablk did not undermine the other alert Trooper Jansen said Rex displayed
when sniffing the trunk—faster breathing. Furthermore, Dr. Cablk's opinion is
undermined somewhat by the fact she could not observe Rex during his entire
ambit of the pick-up and trailer. She could only view him for part of that

36

circuit; thus she did not have comparative grounds to see his tail wagging at other places on the car.  Finally, Rex indicated by sitting down off camera, so Dr. Cablk did not observe this behavior as well.

The court concludes that none of Dr. Cablk's testimony serves to undermine the general reliability of Rex.  In addition to the successful find of drugs in the January 9, 2020, traffic stop, we only have evidence of one other stop—the stop of Mr. Rederick on January 3, 2020.  Rex alerted and indicated on that occasion and, although the humans found no drugs, we know with the benefit of Ricky Geidd's later statement that there *were* drugs present on that occasion.  Thus, the court has no evidence that Rex is unreliable generally or that he has ever given a "false positive" alert.[5]

Another factor <u>Harris</u> directs the court to consider is whether Rex's alert and indication on the night of January 9, 2020, was unreliable even if Rex is reliable generally.  No facts were adduced that would cause the court to believe circumstances existed at the traffic stop that night rendering the results of Rex's search unreliable.

There was evidence in the record that on another occasion when the wind was blowing 50 miles per hour that Rex's search behavior was "all over the place."  But the night of January 9 there was testimony of only a little wind, nothing like 50 mph.  There was also no evidence that Rex was behaving

---

[5] Lt. Koltz was adamant that a drug dog can *never* give a false alert.  His reasoning was that a drug dog alerts to the odor of drugs, so the alert is valid, even if actual drugs are not found.  The court rejects this portion of Lt. Koltz's testimony as a beach too far.  If humans are fallible, and we most certainly are, dogs who are trained by humans are no doubt fallible too.

erratically.  Mr. Rederick does not assert that Trooper Jansen cued Rex consciously or unconsciously.

Dr. Cablk testified that, based on testimony she gave in the District of Utah, a court ruled that dogs trained by the Utah POST method are unreliable. The court does not read United States v. Jordan, 455 F. Supp. 3d 1247 (D. Utah 2020), to so hold.  In Jordan, a drug dog, Tank, had *not* indicated at defendant's vehicle as Rex did in Mr. Rederick's case.  Id. at 1249-50.  During the search, Tank's attention was frequently not on defendant's vehicle, but was drawn to passing traffic and things on the sidewalk, leading the court to conclude Tank did not demonstrate a "consistent and intense interest by Tank in the vehicle or any odor coming from it."  Id. at 1253.  In this case, Rex displayed consistent and intense interest in Mr. Rederick's vehicle.

Tank's veterinary records indicated that he suffered serious health conditions causing him pain which might have served to distract him during his search.  Id. at 1250.  Furthermore, the documents produced relative to Tank revealed that his handler had conducted very scant training with him in and around the time of the search at issue in the case—contrary to Rex's extensive and consistent training records herein.  Id. at 1251.  While Rex was tested using blind methodology, Tank was *not* tested using blind methodology. Id. at 1256.

Based on the totality of facts in that case, the Jordan court held that Tank's certification, including the absence of blind testing, as well as the circumstances of the sniff of defendant's vehicle, the court concluded that

38

Tank's sniff was not reliable and did not provide probable cause for the automobile search that ensued.

To be sure, the <u>Jordan</u> court was critical of the Utah POST method of training. <u>Id.</u> at 1257. But the <u>Jordan</u> decision is distinguishable on all the factual grounds highlighted above. In addition, Lt. Koltz testified that when he conducts K-9 training, the South Dakota Highway Patrol manual is merely a guide. He does not follow it slavishly. Therefore, defects in the Utah POST method are not *per se* attributable to Rex.

The bottom line is this. The totality of circumstances, including Rex's training and certification, his good (though short) track record, the behavior he showed at the scene of the traffic stop, and Dr. Cablk's inability to say that Rex was unreliable or that his alert on the night in question was unreliable, lead this court to conclude both Rex and his alert *were* reliable. The court concludes that Rex is generally reliable in detecting the odor of drugs and that his search, alerts, and indication on the night of the traffic stop were reliable.

### 2.     Whether Rex's Alert Provided Probable Cause to Search the Vehicle on the Trailer

Even if Rex is reliable and his alert is reliable, Mr. Rederick argues Rex indicated at most to Mr. Rederick's pick-up, not the red sedan he was towing on the trailer. Because Rex did not indicate to the trailer or the red sedan being towed on that trailer, Mr. Rederick argues Rex's alert did not provide probable cause to search the red sedan. At most, Rex's alert only provided probable cause to search Mr. Rederick's pick-up, the search of which yielded no contraband.

39

Again, the government has a case directly on point.  In <u>United States v.
Tuton</u>, 893 F.3d 562, 567-68 (8th Cir. 2018), a drug detection dog named Hemi
alerted to luggage in a bus's luggage compartment, but Hemi did not display an
indication, which in his case involved either sitting or standing before the
source of the odor and staring at it.  The court nevertheless held that Hemi's
alert to the luggage compartment gave the police probable cause to search
Tuton's bag which was in the compartment.  <u>Id.</u> at 571.  <u>See also</u> <u>United States
v. Holleman</u>, 743 F.3d 1152, 1154, 1156 (8th Cir. 2014) (drug dog who alerted
but did not indicate when led around defendant's vehicle nevertheless supplied
probable cause to search the vehicle); <u>United States v. Parada</u>, 577 F.3d 1275,
1282 (10th Cir. 2009) (same).

The court has found as a matter of fact based on Trooper Jansen's
testimony that Rex indeed alerted to the trunk of the red sedan.  The court
rejected Dr. Cablk's testimony that Rex did not alert because Dr. Cablk was not
in a good position to see and compare Rex's tail wagging at the trunk as
compared to other places on his circuit round the pick-up and trailer.  Also, as
mentioned, Dr. Cablk did not dispute or refute Trooper Jansen's testimony that
Rex also alerted to the trunk of the red sedan by breathing quickly in his "air
compressor" fashion.  Having found that Rex is reliable generally, that he in
fact alerted to the trunk of the red sedan, and that his alert on January 9 was
reliable, the court concludes that Rex's alert to the trunk of the red sedan
supplied the officers with probable cause to search that location.

40

**D.    Whether Mr. Rederick's Statements Were Made in Custody**

Mr. Rederick argues that all of his statements made at the traffic stop on January 9, 2020, should be suppressed as in violation of the rule announced in Miranda.  "[A]n individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Accordingly, a Miranda warning is required prior to law enforcement questioning an individual whenever the individual is in custody and is being interrogated.  United States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007).

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government.  See United States v. Charbonneau, 979 F. Supp. 1177, 1181 (S.D. Ohio 1997).  Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden.  See United States v. Moore, 104 F.3d 377, 392 (D.C. Cir. 1997) (Silberman, J., concurring) ("[I]t is the appellant's burden to establish factually that he was in custody as a pre-condition to an argument that the Constitution protects his silence[.]").  The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have.  See, e.g., United States v. Morriss, No. 06-6010-01-CR-SJ-SOW, 2006 WL 3519344, at *12 (W.D. Mo.

Dec. 6, 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority).  For purposes of this report and recommendation, the court has placed the burden of proving that Mr. Rederick's statements were *not* the subject of custodial interrogation on the government.  See United States v. McCarty, No. CR. 08-50035, 2008 WL 11404530, at *5 (D.S.D. Aug. 25, 2008) (placing burden on government to show defendant's statements were not the subject of custodial interrogation), report and recommendation adopted as modified, 2008 WL 11404531 (D.S.D. Oct. 7, 2008), aff'd, 612 F.3d 1020 (8th Cir. 2010).

A suspect is considered to be "in custody" either upon his or her formal arrest or "under *any other circumstances* where the suspect is deprived of his" or her "freedom of action in *any* significant way."  Griffin, 922 F.2d at 1347 (citing Miranda, 384 U.S. at 444; Berkemer, 468 U.S. at 429).  Absent formal arrest, a suspect is deemed is be "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "degree associated with formal arrest."  Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989). The test is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator.  Berkemer, 468 U.S. at 442; Black Bear, 422 F.3d at 661; Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370.  In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances.

<u>Carter</u>, 884 F.2d at 370 (citing <u>United States v. Lanier</u>, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency:  (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation.  <u>See</u> <u>United States v. Flores-Sandoval</u>, 474 F.3d 1142, 1146-47 (8th Cir. 2007) (citing <u>Griffin</u>, 922 F.2d at 1349). Reference to these factors is helpful, but these factors are not exclusive and custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  <u>Flores-Sandoval</u>, 474 F.3d at 1147 (citation omitted).  In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered.  <u>Griffin</u>, 922 F.2d at 1348; <u>Carter</u>, 884 F.2d at 370.

In <u>United States v. Czichray</u>, 378 F.3d 822, 827 (8th Cir. 2004), the Eighth Circuit cautioned the <u>Griffin</u> factors are by no means exhaustive and should not be applied "ritualistically."  The Eighth Circuit has emphasized "an express advisement that the suspect is not under arrest and that his

participation in any questioning is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody.  United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005).  The Eighth Circuit regards the twin admonitions that the suspect is free to leave and does not have to answer questions to be "weighty in the custody analysis."  United States v. Perrin, 659 F.3d 718, 720-21 (8th Cir. 2011).  The Griffin factors still appear in Eighth Circuit case law after Czichray and continue to be cited with approval for determining the custody issue.  See id.

Mr. Rederick began asking at five minutes into the traffic stop if he could leave—he and Trooper Peterson had only just sat down in the patrol car at approximately the three-minute mark.  He continually asked to leave throughout the traffic stop.  Because Mr. Rederick's requests at this early stage of the traffic stop were unreasonable—no officer can check licensing, registration, and insurance on two vehicles and write a ticket in two minutes— the court does not take his questions as conclusive of the issue.

However, at 16:36 Trooper Peterson finished writing the warning ticket and, at this point, Trooper Peterson clearly told Mr. Rederick that he was not free to leave.  No Miranda warnings were given.  All statements made by Mr. Rederick from 16:36 forward on Exhibit 3 should be suppressed as he was in custody during this time.  Additionally, the government does not dispute that he was subject to interrogation during this time.

As to statements made prior to 16:36 on the video, the court concludes Mr. Rederick was not in custody.  In reality, it is highly unlikely Trooper

44

Peterson would have allowed Mr. Rederick to leave at any point once he stopped him unless they searched his vehicles and came up empty-handed. But, as discussed above, the test is whether a reasonable person in Mr. Rederick's position—not Trooper Peterson's position—would have thought they were free to go.

The Supreme Court in Berkemer v. McCarty, 468 U.S. 420 (1984), addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of Miranda. After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that Miranda warnings are required. Berkemer, 468 U.S. at 434-35. However, during the traffic stop itself and prior to arrest, the Court held that Miranda applies only when and if the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" Id. at 440-41 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam).

The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away once stopped. Id. at 436. However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in Miranda. Id. at 436-38. For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation. Id. at 437. Also, the interrogation takes place in

public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438.  Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Id. at 440.

The Berkemer Court directed courts to consider factors such as the following in determining whether a suspect at a traffic stop was "in custody" such that Miranda warnings were required:  period of time elapsed between the traffic stop and the arrest, whether the suspect was informed his detention was only temporary or that he was not under arrest, and the character and nature of the interaction between the police and the suspect at the stop.  Id. at 441-42.

The Eighth Circuit discussed the application of Berkemer to a traffic stop in United States v. Morse, 569 F.3d 882 (8th Cir. 2009).  In that case, police stopped the vehicle in which Morse was a passenger.  Id. at 883.  The driver was arrested for driving with a suspended license and the officer asked Morse to exit the vehicle so as to conduct a search of the vehicle incident to arrest. Id.  When Morse exited, the officer told Morse he was going to conduct a pat-down search and asked Morse if he had anything on his person the officer should know about.  Id.  At that point, Morse told the officer he had crack cocaine in his pocket.  Id.  Morse later moved to suppress his statement and

46

the fruits of the officer's search of his person because the interrogation by the officer was without benefit of <u>Miranda</u> warnings.  <u>Id.</u>

The district court granted the motion to suppress, declining to apply the holding of <u>Berkemer</u> because the district court held that "the questioning of [Morse] was not in connection to the reason for the stop and far exceeded a routine roadside questioning." <u>Id.</u> at 884.  The Eighth Circuit reversed, holding that <u>Berkemer</u> controlled the analysis.  <u>Id.</u> at 884-85.  The court held that, under <u>Berkemer</u>, the mere fact that Morse did not feel free to leave was not determinative of whether <u>Miranda</u> warnings were required.  <u>Id.</u>  In addition, the court noted that Morse was asked only a "modest number of questions" and the facts did not establish a situation tantamount to a formal arrest.  <u>Id.</u>

Here, up to the point Trooper Peterson told Mr. Rederick he was not free to leave at 16:36, this appeared from all outwardly observable circumstances to be a normal traffic stop.  Trooper Peterson took Mr. Rederick's driver's license and insurance information, he was checking to see if the pick-up and trailer were licensed to Mr. Rederick (or if they were reported as stolen), he was checking to see if there were any outstanding arrest warrants for Mr. Rederick, and he was preparing a written warning ticket.  As such, the period before 16:36 on the video falls within the holding of <u>Berkemer</u>.  Accordingly, the court recommends that all statements by Mr. Rederick prior to 16:36 on the video *not* be suppressed and that all statements after that time on the video *be* suppressed.

**E.    Whether Subsequently-Discovered Evidence Should Be Suppressed as Fruit of the Poisonous Tree**

Mr. Rederick argues that the evidence from the search warrants executed at his home, on his person, and on his cell phone should be suppressed as poisonous fruit of the Fourth Amendment violation at the traffic stop.  Other than arguing that the search warrants derive from illegally-obtained evidence from the traffic stop, Mr. Rederick makes no other argument that the search warrants are invalid or lacking in probable cause.  The court has found that no Fourth Amendment violation occurred at the traffic stop, so the search warrants were not derived from a constitutional violation.

The court *has* concluded that Mr. Rederick's statements should be partially suppressed as violative of the rule announced in Miranda.  However, none of those statements appear in Agent Pennock's search warrant affidavits.  See Exhibits 1 & 2.  Therefore, the search warrants were not derived from or dependent upon the Miranda violation.  The court recommends denying Mr. Rederick's motion to suppress the fruits of the search warrants duly issued by the state court.

**CONCLUSION**

Based on the foregoing law, facts, and analysis, this magistrate judge respectfully recommends that Mr. Rederick's motion to suppress [Docket No. 42] be granted in part by suppressing any statements made after 16:36 on the dashcam video of Trooper Peterson (Exhibit 3).  The court recommends that Mr. Rederick's motion to suppress be denied in all other respects.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED June 25, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge