UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LARRY DEAN REDERICK,<br><br>Defendant. | 4:20-CR-40066-01-KES<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS |

Defendant, Larry Dean Rederick, is charged with possession of a controlled substance with intent to distribute and conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. Docket 58. Rederick moves to suppress all evidence obtained during a stop and search of his vehicles and evidence obtained pursuant to search warrants for his home and cell phone. Docket 42. Rederick contends that this evidence was obtained in violation of the Fourth Amendment to the United States Constitution.[1] *Id.* The motion was referred to a United States magistrate judge for a report and recommendation under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary

---

[1] Rederick's motion to suppress also claimed that all statements made after he first asserted his right to remain silent should be suppressed as a violation of *Miranda*. Docket 43 at 11. The magistrate judge granted this motion as to statements made after 16:36 on Trooper Peterson's dashcam video and denied this motion as to statements made before this time. Docket 55 at 48. Rederick does not object to either of these conclusions. *See* Docket 62. The government also does not object.

hearing, Magistrate Judge Veronica Duffy recommended that Rederick's motion to suppress be denied in part and granted in part. Docket 55. Rederick objects to several of the magistrate judge's factual findings and to most parts of the Report and Recommendation denying his motion to suppress. Docket 62.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980) (holding dispositive motions under 28 U.S.C. § 636(b)(1) are subject to de novo review by the district court). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTUAL BACKGROUND

According to the testimony given and the exhibits offered at the evidentiary hearing, the pertinent facts are as follows:

In May 2019, Ryan Pennock, an agent with the South Dakota Division of Criminal Investigation began a narcotics investigation into Larry Rederick.

2

Docket 56 at 7. On May 28, 2019, Agent Pennock interviewed Person #1, who was then in jail for possession of suspected methamphetamine. *Id.* at 8. Person #1 told Agent Pennock that Rederick, whom she had met two weeks prior, had supplied her with methamphetamine. *Id.* She also conveyed to Agent Pennock that Rederick referred to himself as "Cartel," she believed he always had at least two ounces of methamphetamine on him, and she had recently accompanied him to Irene, South Dakota, where she believed he had acquired a kilogram of methamphetamine. *Id.* at 9. Person #1 also identified Rederick's residence and described multiple locations around that property where she believed Rederick stored drugs. *Id.* at 10.

That same day, Agent Pennock interviewed Person #2, who was also in jail for possession of suspected methamphetamine and who had been introduced to Rederick by the same person that introduced Person #1 to Rederick. *Id.* at 8, 10-11. Person #2 told Agent Pennock that she had received user amounts of methamphetamine from Rederick on multiple occasions, as well as two grams of psilocybin mushrooms. *Id.* at 11. Person #2 also described "frequent come-and-go traffic" at Rederick's residence and that Rederick had discussed needing to "re-up" from a location that was approximately five hours away. *Id.* at 11-12. Agent Pennock understood the come-and-go traffic and the reference to a "re-up" to be consistent with drug distribution. *Id.* at 12.

In October 2019, Agent Pennock interviewed Person #3, who had been arrested while in possession of seven ounces of methamphetamine and who identified himself as a methamphetamine distributor. *Id.* at 12-13. Person #3

3

told Agent Pennock that he had arranged to sell Rederick one pound of methamphetamine, but that this sale had not been completed. *Id.* at 13. Person #3's phone was seized by law enforcement, and after a forensic examination of the phone, Agent Pennock viewed text messages between Person #3 and another individual that appeared to discuss taking over Rederick's drug distribution. *Id.* at 14-15. He also viewed text messages between Person #3 and a phone number Agent Pennock knew to be associated with Rederick that discussed drug transactions between them. *Id.* at 15-17.

Also in October 2019, Agent Pennock was contacted by Person #4, who was then in jail. *Id.* at 18-19, 21. Person #4 told Agent Pennock that in July 2019, when he was working for Rederick as a mechanic, he had observed Rederick smoke methamphetamine and Rederick had provided him with methamphetamine. *Id.* Person #4 also described seeing Rederick remove a duffel bag from the toolbox of his truck, inside of which Person #4 believed there was about 10 pounds of methamphetamine, divided into six or seven packages. *Id.* at 19-20. Rederick cut open one of these packages in front of Person #4 and gave him two grams of methamphetamine from it. *Id.* at 20. Person #4 also reported that Rederick said the source of the methamphetamine was Kansas City and that he had traveled to Omaha to get it. *Id.*

In December 2019, Agent Pennock also spoke with a Yankton Police Department confidential informant (CI) who reported receiving methamphetamine several times from Rederick and being told by Rederick that he sourced his methamphetamine from the Omaha area. *Id.* at 21-23. The CI

also stated that he had been to Rederick's residence and had seen methamphetamine there as well. *Id.* at 23.

Following the conversation with the CI, Agent Pennock applied for and received a pen register, which allowed him to see the phone numbers Rederick was communicating with, and a warrant for cell site location information, which allowed him to track the general location of Rederick's phone. *Id.* at 23-24. From the pen register information, Agent Pennock learned that Rederick was communicating with Lance Willits, and Pennock learned from a Nebraska narcotics investigator that Willits was involved in narcotics. *Id.* at 24-25.

On January 3, 2020, Agent Pennock learned from the electronic surveillance that Rederick was returning from Texas, and he instructed officers to stop Rederick if they had probable cause. *Id.* at 36-37. Officers pulled Rederick over, and Trooper Jansen, of South Dakota Highway Patrol, and his dog, Rex, conducted a search of Rederick's vehicle. *Id.* at 37-38. Rex indicated to the presence of drugs, but the officers did not find any drugs. *Id.* at 38-39.

On January 9, 2020, Agent Pennock learned from the electronic surveillance that Rederick had left his residence and was travelling south on Highway 81, while in frequent communication via text messages with Willits. *Id.* at 25-26. Around four o'clock in the afternoon, this data showed Rederick arriving at Willits's residence, which was not far from Norfolk, Nebraska. *Id.* at 25-27. Around the time of Rederick's arrival, Rederick and Willits stopped communicating via text message. *Id.* at 27. This was Rederick's third visit to Willits's residence of which Agent Pennock was aware. *Id.* at 42.

5

Agent Pennock had followed Rederick to this general area and parked at a nearby restaurant to avoid electronic surveillance he had previously observed at Willits's residence. *Id.* at 27-28. He continued to monitor the pen register and cell site information, and he contacted members of the South Dakota Highway Patrol, including Troopers Eric Peterson and Cody Jansen, to inform them that he would like to have Rederick stopped upon his return to South Dakota because he believed this trip to be narcotics related. *Id.* at 26-28, 61.

Around five o'clock, the electronic surveillance data indicated that Rederick had left Willits's residence and gone to Norfolk, Nebraska. *Id.* at 29. Then, shortly before 7 o'clock, it showed Rederick and Willits communicating again via text message, and shortly thereafter, it indicated Rederick had returned to Willits's residence. *Id.* At 8 o'clock, Agent Pennock observed a vehicle he believed to be Rederick's driving past where Agent Pennock was parked. *Id.* Agent Pennock began following Rederick back toward South Dakota, and he informed the Highway Patrol officers with whom he had been in contact of his observations from the electronic surveillance, and he asked them to stop Rederick, preferably by developing their own probable cause so as to not jeopardize the narcotics investigation into Rederick. *Id.* at 29-32.

Based on Agent Pennock's description of the vehicle and electronic surveillance updates, Trooper Peterson saw Rederick's vehicle cross into South Dakota and began following it. *Id.* at 63. Rederick was driving a pick-up truck that was towing a trailer with a sedan on the trailer. *Id.* at 29. Trooper Peterson testified that the license plate on the trailer was not properly illuminated in

accordance with South Dakota law. *Id.* at 64. Based on this, Trooper Peterson initiated a traffic stop and Rederick pulled over. *Id.*

Trooper Peterson made contact with Rederick through the driver's seat window, and he asked Rederick to come back to his squad car with him to complete a warning, which Rederick did. *Id.* at 65-66. While completing a warning, Trooper Peterson requested that Trooper Jansen and Rex come to his location. *Id.* at 72-73. When Trooper Jansen arrived, Trooper Petersen asked him to run Rex around Rederick's truck and trailer. *Id.* at 135.

Trooper Jansen walked around the truck and trailer once to look for any hazards, and then he circled the truck and trailer twice with Rex. *Id.* The first time around was a "free pass," and the second time around Trooper Jansen pointed to specific areas he wanted Rex to sniff. *Id.* Trooper Jansen testified that he observed Rex's alert behaviors on the driver's side of the truck, on the trunk of the sedan that was on the trailer, and on the passenger side door of the truck. *Id.* at 139. Alert behaviors are innate behaviors that a dog displays when detecting a drug odor, and according to Trooper Jansen, Rex's alert behaviors include wagging his tail faster than normal, doing head checks, and breathing fast "like an air compressor." *Id.* at 136-38. Rex then indicated by sitting down at the truck's passenger side door, which means that the dog thinks that is the source of the drug odor. *Id.* at 140. Although parts of Rex's deployment can be seen on Trooper Peterson's and Trooper Jansen's dashcam videos, some portions are obstructed by the vehicles. *See* Exhibits 3-4.

7

Trooper Jansen informed Trooper Peterson that Rex had alerted and indicated, and that this provided probable cause to search the vehicles. *Id.* at 142. In the trunk of the sedan, officers found several baggies of a substance that appeared to be methamphetamine and that field tested positive for methamphetamine. *Id.* at 76. After Agent Pennock learned that Trooper Jansen discovered methamphetamine in the sedan, he applied for and received search warrants for Rederick's residence and phone. *Id.* at 33. A search of Rederick's residence turned up drug paraphernalia. *Id.* at 35.

## DISCUSSION

Rederick objects to many of the magistrate judge's factual findings and to the conclusions of law that followed from those findings. As an initial matter, Rederick objects to the inclusion of any facts gleaned from Agent Pennock's interview with Ricky Geidd on May 28, 2020, because Agent Pennock did not have this information until after the stop. Docket 62 at 4-5. Although it appears the magistrate judge included this information in her analysis of whether Rex was reliable, Docket 55 at 37, none of the court's following findings relied on information from Geidd.

### A. Probable Cause That Rederick Violated SDCL § 32-17-11

The magistrate judge found that Trooper Peterson had probable cause for the traffic stop because the license plate on his trailer was not properly illuminated. Docket 55 at 24. Police can make a traffic stop of a vehicle without violating the Fourth Amendment when there is "probable cause to believe that a traffic violation has occurred," *Whren v. United States*, 517 U.S. 806, 810

8

(1996), no matter how minor the violation, *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008). Rederick objects to the magistrate judge's conclusion that, under SDCL § 32-17-11, a white light is required to illuminate a license plate. Docket 62 at 5. He also objects to the magistrate judge's finding that, even if illuminating a license plate with red taillights complied with SDCL § 32-17-11, the trailer's license plate was not illuminated by the red taillights on his trailer. *Id.* at 10.

The only rear lights on Rederick's trailer are red taillights. *See* Docket 56 at 93. Rederick argues that "SDCL § 32-17-11 is an either-or-statute," and that a white light is only required if a motorist opts to illuminate the license plate with a light other than the taillights that are required by SDCL § 32-17-8. Docket 62 at 10. This interpretation, however, is contrary to the text and structure of SDCL § 32-17-11. *See Farm Bureau Life Ins. Co. v. Dolly*, 910 N.W.2d 196, 199-200 (S.D. 2018) ("When interpreting a statute, we begin with the plain language and structure of the statute." (quoting *Magellan Pipeline Co. v. S.D. Dep't of Revenue & Reg.*, 837 N.W.2d 402, 404 (S.D. 2013))).

South Dakota Codified Law § 32-17-11 reads, in pertinent part: "Either the rear lamps required by § 32-17-8 or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear." In this section, "white light" does not appear immediately before or after "a separate lamp," but rather in the middle of a clause describing how a license plate is to be illuminated and from what distance it must be legible. This clause

9

and its requirements, including a white light, must also apply to "the rear lamps required by § 32-17-8," otherwise there is no purpose in including those lamps in this sentence. *See Jensen v. Turner Cnty. Bd. of Adjustment*, 730 N.W.2d 411, 415 (S.D. 2007) ("When we interpret a statute . . . effect should be given to every part and every word."). Thus, Rederick's failure to illuminate his license plate with a white light provided Trooper Peterson with probable cause to make a traffic stop.

Alternatively, even if Rederick's interpretation of SDCL § 32-17-11 is correct, the court has reviewed Trooper Peterson's dashcam footage and agrees with the magistrate judge's finding that the license plate is not illuminated by the trailer's red taillights. Though the license plate is illuminated in the dashcam video, that illumination comes from Trooper Peterson's headlights. *See* Exhibit 3. Trooper Peterson testified that, absent his headlights, the license plate was not legible from 50 feet. Docket 56 at 101. This is consistent with the location of the trailer's license plate, which was not on the rear of the trailer near the taillights, but instead was underneath the trailer and on the side of the trailer, *between* the taillights and Rederick's truck. *See* Docket 56 at 101; Exhibit 3. This too provided Trooper Peterson with probable cause to make the traffic stop.

### B. Reasonable Suspicion That Rederick Was Involved in Drug Trafficking

As an alternative justification for the traffic stop, the magistrate judge also found that Peterson had reasonable suspicion Rederick was involved in drug trafficking. Docket 55 at 24. Rederick objects to this conclusion. Docket

62 at 11-12. A traffic stop does not violate the Fourth Amendment when an officer has reasonable suspicion that the person is engaged in criminal activity. *Navarette v. California*, 572 U.S. 393, 396-97 (2014). Such reasonable suspicion is assessed on the totality of the circumstances, and it requires " 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Id.* at 397 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). An officer's "hunch," however, is not enough. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Instead, an officer must have a "particularized and objective basis" for suspecting that a person is engaged in criminal activity. *Id.* at 396-97 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Reasonable suspicion need not be based solely on an officer's own personal observations; an officer can rely on information provided by other members of the investigative team. *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018).

### 1. Rederick's Objections to Factual Findings that Support Reasonable Suspicion

Rederick objects to the magistrate judge's finding that Willits was a drug dealer. Docket 62 at 2. He claims that, although Willits had prior drug arrests, the only evidence in the record that Willits was still involved in drug trafficking during the relevant period was "a bare bones . . . double hearsay statement." *Id.* As an initial matter, the magistrate judge appears to not have made a specific factual finding that Willits was involved with drug trafficking during the relevant period. Instead, the magistrate judge summarized Agent Pennock's

testimony regarding what he knew or had been told about Willits. Docket 55 at 5 ("A detective in Nebraska . . . told Agent Pennock that Willits was a drug dealer with prior convictions."); *id.* at 27. ("Rederick began having contact with Lance Willits . . . [who] was believed to be currently involved in drug trafficking, and who had prior drug convictions."). Though the magistrate judge did partially rely on this information in concluding that Trooper Peterson had reasonable suspicion to make a traffic stop, reasonable suspicion can be formed with information supplied by other members of the investigative team. *Collins*, 883 F.3d at 1032.

Rederick next contends that findings of fact are "missing" from the Report and Recommendation. Docket 62 at 3-4. Rederick claims that "between October 5th and January 9th, law enforcement had no information that [Rederick] ever went to Norfolk to get drugs," and that this "should have been included" in the magistrate judge's findings of fact. *Id.* at 4. For this assertion, Rederick points to statements from one of the named informants and from the CI that Rederick's supplier was in the Omaha area, which is "approximately 118 miles or two hours from" Norfolk. *Id.* But this is not the only information law enforcement had about the location of Rederick's suspected supplier. As described above, Agent Pennock knew that Rederick had been in contact with and had visited Willits, who had previous drug arrests and who Pennock had been told was involved with drugs. Docket 56 at 24. Agent Pennock also knew that Person #3, who had lived in Norfolk, was Rederick's previous supplier. *Id.* at 31. And although Person #3 had been arrested prior to the traffic stop on

January 9, 2020, as Agent Pennock explained, "it is not uncommon in the trafficking of narcotics that when a source of supply" is arrested, that the individuals above the arrested person in the supply chain "still need to and want to distribute the narcotics they had been distributing." *Id.* at 58-59. Thus, Agent Pennock could reason that Rederick was now receiving drugs from someone else in Norfolk.

Rederick also argues that the magistrate judge should have made a finding that, Rederick "was not [at Willits's residence] for a short duration on either occasion as he was there for approximately an hour both times." Docket 62 at 3. According to Rederick, this is significant because it is "contradictory to Pennock's prior testimony" that the "frequent come-and-go traffic" at Rederick's residence was consistent with people coming to purchase drugs because those individuals will "typically stay for a short duration." *Id.*; *see* Docket 56 at 11-12. But it is immaterial whether Rederick was at Willits's residence for a short or long period. Agent Pennock's statement that people "typically" stay for a short period of time when buying drugs does not mean that they always stay for a short period of time. For example, individuals buying user amounts, as three of the named informants bought from Rederick, may take less time than buying a larger re-supply of drugs, as Agent Pennock suspected Rederick was doing at Willits's residence.

### 2. Reliability of the Named Informants and the CI

In finding that Trooper Peterson had reasonable suspicion Rederick was involved in drug trafficking, the magistrate judge partially relied on information

provided by the named informants and the CI. Docket 55 at 26-27. Rederick objects to the magistrate judge's finding that the information supplied by the CI was against his penal interest and argues that none of the informants were established as reliable. *See* Docket 62 at 1-2; 12.

Reasonable suspicion can be based on information supplied by informants if there are sufficient markers of reliability. *Navarette*, 572 U.S. at 397-98. For example, "[a]n informant's statement against his or her own penal interests (even if others are also implicated) is presumptively credible." *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005). Information is also more reliable if it is about events the informant witnessed firsthand. *Illinois v. Gates*, 464 U.S. 213, 234 (1983) ("[E]ven if we entertain some doubt as to the informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."). Partially or wholly corroborated evidence is also reliable. *United States v. Nieman*, 520 F.3d 834, 839-40 (8th Cir. 2008); *see also United States v. Stevens*, 530 F.3d 714, 718-19 (8th Cir. 2008) ("The corroboration of even innocent, minor details can support a finding of probable cause."). Although known informants are more reliable than anonymous or confidential informants, *see United Sates v. McAtee*, 481 F.3d 1099, 1103 (8th Cir. 2007), even a single anonymous tipster can establish reasonable suspicion if there are sufficient other indicia of reliability, *see Navarette*, 572 U.S. at 398-399.

Here, there were five individuals who stated that they had either bought methamphetamine from Rederick or sold methamphetamine to him. Docket 56 at 8, 11, 13, 19, 22. Rederick argues that because "there is no evidence in the record regarding the reliability or accuracy of the CI's prior information . . . there is no evidence that the CI provided information against his own penal interests." Docket 62 at 1. Rederick also suggests that the information provided by the four named informants is not reliable because each of them was interviewed in jail and thus "had motives to lie to help them with their own charges." *Id.* at 2. But it is precisely because each provided information adverse to their own penal interests that they are "presumptively credible." *Leppert*, 408 F.3d at 1042. Requiring that the government first demonstrate that an informant is reliable before determining whether they provided information adverse to their penal interest would get the presumption from *Leppert* exactly backwards. *See id.*

There is also ample evidence of the informants' reliability beyond each of them giving statements adverse to their own penal interests. Each of them provided detailed information based on their first-hand observations of Rederick and his activities, which included Rederick referring to himself as "Cartel," storing methamphetamine in his camper and at his mechanic shop, describing his need to "re-up" his drug supply, and storing ten pounds of methamphetamine in his truck. Docket 56 at 9-12, 20; *see Gates*, 462 U.S. at 234 (first-hand knowledge entitled to greater weight). Even their descriptions of Rederick's living arrangements—in a camper on his parents' farm outside of

15

Wakonda, South Dakota—were consistent. Docket 56 at 11, 19. 23; *see Stevens*, 530 F.3d at 718-19 ("The corroboration of even innocent, minor details can support a finding of probable cause."). The informants' statements were further corroborated by the text messages recovered from Person #3's phone describing drug transactions between Person #3 and Rederick. Docket 56 at 14-18. Finally, though it is unclear from the record whether Agent Pennock knew the name of the CI, he did know the names of the other four informants, and he personally interviewed all of them, including the CI. *See McAtee*, 481 F.3d at 1103 (known informants more reliable than anonymous or confidential informants). Given all this evidence, the court finds that there were sufficient markers of reliability for the named informants and for the CI.

### 3. Staleness of Information

Rederick next argues that, by the time Trooper Peterson made the traffic stop, the evidence from the named informants had become stale. Docket 62 at 2, 11. Reasonable suspicion must exist at the time the traffic stop is made, and the passage of time "between the occurrence of the facts supplied" and the traffic stop can render those facts too stale to support the existence of reasonable suspicion. *See United States v. Stachowiak*, 521 F.3d 852, 856 (8th Cir. 2008). "There is no bright-line test for determining when information is stale." *Id.* (citing *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993)). Instead, courts must consider "the context of a specific case and the nature of the crime under investigation." *Id.* A "lapse of time is least important when the suspected criminal activity is continuing in nature." *United States v. Lemon*,

16

590 F.3d 612, 614 (8th Cir. 2010) (citing *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999)); *see United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (upholding search warrant based on three-year and fourth month-old information because possession of the firearm was a continuing offense). Drug trafficking is a type of criminal activity that is continuing in nature. *See Stachowiak*, 521 F.3d at 856. Additionally, "where recent information corroborates otherwise stale information," reasonable suspicion can still be found. *See United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995).

Here, except for the CI, Agent Pennock last spoke with an informant about Rederick on October 5, 2019, more than three months before the traffic stop on January 9, 2021. Docket 62 at 2, 11. But the named informants described Rederick distributing methamphetamine from mid-May 2019 until at least October 4, 2019. Docket 56 at 8, 11, 13, 19, 22. Given the continuing nature of his suspected criminal activity, this three-month gap is of diminished significance, and the information provided by the named informants was not stale. *See Lemon*, 590 F.3d at 614; *Stachowiak*, 521 F.3d at 856.

Alternatively, even if the information from the named informants was stale, it was corroborated by more recent information. *See Ozar*, 50 F.3d at 1446. Agent Pennock interviewed the CI on December 3, 2019, after which he applied for and received a pen register and a warrant for cell site location data. Docket 56 at 22-24. From this electronic surveillance, Agent Pennock could see that Rederick was communicating with Lance Willits, who he knew from another law enforcement officer to be involved with drugs and who lived

17

outside of a town not far from Norfolk, Nebraska. *Id.* at 24-25. Person #3,

Rederick's previous drug supplier, resided in Norfolk prior to being arrested. *Id.*

at 31. Agent Pennock observed Rederick communicating with Willits on the day

of the traffic stop, and he observed Rederick leaving South Dakota, traveling to

Willits's residence, and then returning to South Dakota soon after. *Id.* at 25-29.

Agent Pennock communicated this information to Trooper Peterson. *Id.* at 29-

30, 61. Under a totality of the circumstances analysis, this more recent

corroboration of the information from the informants—indeed, same-day

corroboration—provides sufficient specific, articulable facts for Trooper

Peterson to have reasonable suspicion to support the traffic stop.

### 4. Reasonable Suspicion After the January 3rd Traffic Stop

Rederick's final argument against reasonable suspicion is that, even if

there was reasonable suspicion to conduct a traffic stop, it "dissipated in the

traffic stop and search of [Rederick] on January 3, 2020, when nothing was

discovered" following an alert and indication from Trooper Jansen's dog. Docket

62 at 12. To hold otherwise, Rederick argues would be the same as "allow[ing]

[the government] to stop [Rederick] 24 hours per day and 7 days per week

anytime he leaves his home after October 5, 2019." *Id.* This argument fails for

two reasons. First, as Agent Pennock testified, because Rex is trained to detect

the odor of drugs, the fact that Rex indicated on Rederick's vehicle on January

3rd provides support for Agent Pennock's belief that there had been drugs in

his vehicle at some point. Docket 56 at 39. Second, as described above, Agent

Pennock gained additional information to support reasonable suspicion after

January 3rd based on the electronic surveillance that showed Rederick in contact with Willits and returning from Willits's residence. *Id.* at 25-29. As a result, the court finds that reasonable suspicion did not dissipate after the January 3, 2020, traffic stop.

### C. Extension of the Traffic Stop

The magistrate judge concluded that, because the purpose of the traffic stop was to investigate Rederick for drug trafficking and because reasonable suspicion of his involvement in drug trafficking "did not dissipate" during the stop, the traffic stop was not illegally prolonged in violation of Rederick's Fourth Amendment rights. Docket 55 at 28-32. Rederick objects to this conclusion "for the same reasons" that he objected to the magistrate judge's conclusion that Trooper Peterson had reasonable suspicion of drug trafficking to initiate the traffic stop. Docket 62 at 13. Because the court has already addressed these objections in concluding that Trooper Peterson did have reasonable suspicion to initiate a traffic stop, it also finds that the traffic stop was not prolonged in violation of Rederick's Fourth Amendment rights.

### D. Probable Cause to Search Vehicles

The magistrate judge found that Trooper Jansen's dog, Rex, alerted to the trunk of the sedan and that Rex was reliable, providing probable cause to search the sedan, where the officers found methamphetamine. Docket 55 at 39-40. Rederick makes several objections related to these findings and to the conclusion that there was probable cause. Docket 62 at 13-14.

## 1. Rederick's Request for an Adverse Inference

As an initial matter, Rederick claims that "a separate dog handler training policy" was disclosed for the first time during the evidentiary hearing before the magistrate judge, despite his previous subpoena for all dog training documents. Docket 62 at 8. He requests that this court draw an "adverse inference that the training policy would have shown that [Highway Patrol]'s dog training program did not produce a well-trained and reliable dog in Rex." *Id.*

In the civil context, Eighth Circuit precedent instructs that "the adverse inference instruction is appropriate only where the spoliation or destruction of evidence is intentional and indicates a fraud or desire to suppress the truth." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004) (citing *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1111-12 (8th Cir. 1988)). Before issuing an adverse inference instruction, a court must also find that the destruction of evidence was prejudicial to the party seeking the instruction. *Id.* at 748. Although the Eighth Circuit "has not applied the spoliation doctrine in a criminal case," it has implied that if it "were to do so, a showing of the government's bad faith would be required." *United States v. Tyerman*, 701 F.3d 552, 561 (8th Cir. 2012) (citation omitted).

There is little precedent concerning adverse inferences at the motion to suppress stage of litigation. *See United States v. Fletcher*, 2013 WL 2368831, at *7 n.8 (D. Minn. May 29, 2013) ("This Court is also unaware of any Eighth Circuit precedent . . . where the evidence that was destroyed relates only to an issue bearing on the constitutionality of a search and not to a substantive

20

element of the charged criminal offense."). But the courts that have considered this issue in this procedural posture have required a showing of both bad faith and prejudice before drawing an adverse inference on a motion to suppress. *See United States v. Cottom*, 2015 WL 9308226, at *7 (D. Neb. Dec. 22, 2015); *Fletcher*, 2013 WL 2368831, at *7.

Rederick cannot meet either the bad faith or prejudice requirement for drawing an adverse inference. Although Highway Patrol was initially non-responsive to Rederick's subpoena for dog training documents, the parties then stipulated to a production method and schedule, and Rederick's attorney notified the court that the requested documents had been produced. Dockets 33, 40, 41. To the extent documents were not included in this production that should have been, the testimony at the evidentiary hearing does not demonstrate that this was the result of "a desire to suppress the truth." *Stevenson,* 354 F.3d at 746. Instead, it appears there may have been disagreement or confusion about whether the subpoena's reference to "training materials" included the missing document. Though Rederick describes this missing document as "a separate dog handler training policy," it appears from Trooper Jansen's testimony that the pertinent document is the Highway Patrol's general Policy Manual, which includes a section on dogs. Docket 56 at 171. This is also consistent with Lt. Koltz's testimony. *Id.* at 290-91. The court also finds it relevant that, not only is there no allegation that the Policy Manual was destroyed, as is generally the case with spoliation, the Policy Manual is in

fact publicly available.[2] Thus, the court finds that Rederick has not demonstrated that the Policy Manual was withheld out of "a desire to suppress the truth." *See Stevenson,* 354 F.3d at 739.

Rederick also cannot show that he was prejudiced by the Highway Patrol not producing the relevant section of the Policy Manual. Rederick, through his attorney, had the opportunity to question both Trooper Jansen and Lt. Koltz about the content of the police dog section of the Policy Manual. His attorney asked Trooper Jansen no questions about its content, and Lt. Koltz testified that "it outlines the hours of training, but it does not say what the regimen[] of training is." Docket 56 at 171, 290-92. Importantly, the Highway Patrol did produce the Police Dog Service Manual, a "large . . . inclusive" manual that provides far more detail about the Highway Patrol's dog training regimen, and it produced the grade sheets and training records for Trooper Jansen and Rex. *See* Dockets 52, 54, 56 at 290. Rederick has not shown how he was prejudiced by not being provided portions of the Policy Manual, which would provide less detailed information than the documents he was provided.

### 2. Whether Rex Alerted to the Sedan

Rederick objects to the magistrate judge's finding that Rex alerted to the sedan that was on the trailer. Docket 62 at 5, 14. He claims that the dashcam

---

[2] At the evidentiary hearing, Rederick introduced into evidence a portion of Highway Patrol's Policy Manual pertaining to "Audio and Visual Recorders." Docket 53-3 at 15-16. On the first page of this excerpt is a website address. *Id.* at 15. Though this specific URL appears to be broken, the "Policy Manual" is accessible to the public through a dropdown menu in the South Dakota Highway Patrol section. *See* https://dps.sd.gov/safety-enforcement/highway-patrol/policy-manual.

videos do not show Rex wagging his tail faster than normal, one of Rex's alert behaviors, at the trunk of the sedan. *Id.* at 5-6. The court agrees with Rederick's statement that it is not "objectively viewable" that Rex is wagging his tail faster than normal near the trunk of the sedan. But this may be because only a portion of Rex's deployment around the sedan is visible on the dashcam videos, making it difficult to compare Rex's tail speed at different points. *See* Exhibits 3-4. Trooper Jansen, who could observe Rex throughout the entirety of this deployment and who is most familiar with Rex's alert behaviors, testified that Rex did demonstrate this alert behavior at the trunk of the sedan. Docket 56 at 140. Even if this court were to find that Rex did not alert via this behavior, Trooper Jansen also testified that Rex's breathing was faster at the sedan's trunk, and this was an alert behavior. *Id.* Rederick has not put forward any evidence to call this alert behavior into question. Thus, the court finds that Rex did alert at the trunk of the sedan.

### 3. Reliability of Rex

A drug dog's alert can be the basis of probable cause to search a vehicle if the dog is reliable generally and if that specific alert is reliable. *See Florida v. Harris*, 568 U.S. 237, 246-47 (2013). "[A] court can presume (subject to any conflicting evidence offered)" that a dog is reliable "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting[.]" *Id.* "The same is true, even in the absence of a formal certification, if the dog has recently and successfully completed a training program . . . ." *Id.* at 247. Defendants can challenge a dog's reliability by "contest[ing] the adequacy of a

certification or training program . . . [or] examin[ing] how the dog (or handler) performed in the assessment made in those settings." *Id.* A dog's and handler's performance in the field may also be relevant. *Id.* Even if a dog is generally reliable, "circumstances surrounding a particular alert may undermine the case for probable cause." *Id.* at 247. When a defendant challenges a dog's reliability, "the court should weigh the competing evidence," and ask "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248. Courts should not apply "an inflexible set of evidentiary requirements." *Id.*

Here, Trooper Jansen and Rex completed a 240-hour training program between September and November of 2019, and Rex satisfactorily completed the testing scenarios needed for certification in November 2019. Docket 56 at 126-29. After certification, Trooper Jansen and Rex had to complete 16 hours of additional training each month. *Id.* at 130.

Rederick raises several objections to the magistrate judge's finding that Rex was generally reliable. First, he objects to the magistrate judge's "failure to find that [Highway Patrol] has a conflict of interest in training and certifying their own drug detection dogs" because "no other outside entity is ever verifying their work," and the Highway Patrol has a "vested interest" in certifying dogs, regardless of their reliability, so "that more of [Highway Patrol]'s searches would pass constitutional muster." Docket 62 at 9. But law enforcement agencies are not precluded from certifying or training their own drug detection

24

dogs. *See Harris* 568 U.S. at 247 ("[L]aw enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources."). Lt. Koltz also denied feeling pressure from his bosses to certify unreliable dogs, and he noted that he has failed several dogs. Docket 56 at 277. Because Rederick can point to no evidence that the Highway Patrol ever improperly certified dogs, the court does not find that there was a conflict of interest in the Highway Patrol's training program that would preclude finding Rex reliable.

Rederick also takes issue with the magistrate judge's finding that the defense's expert, Dr. Cablk, "could not opine [on] whether Rex was unreliable," claiming that she did just that. Docket 62 at 7. But a closer look at her testimony reveals that Dr. Cablk stated that the Utah Post training program, on which the Highway Patrol training manual is based, not Rex, was unreliable. Docket 56 at 242, 250. Dr. Cablk was asked directly whether it was her opinion that Rex was unreliable, and she answered, "I can't tell you that he is or he isn't." *Id.* at 256.

Dr. Cablk's criticisms of the Utah Post Program include its lack of "blind" testing, which is when the handler does not know whether there are drugs in a particular location and which Dr. Cablk said is necessary for reliable training. *Id.* at 209-210, 219. But Highway Patrol does use "blind" protocols in its testing, and it did so during Rex's certification. *Id.* at 204-05, 273-75. This use of "blind" protocols also distinguishes it from the training that a court found

deficient in *United States v. Jordan*, 455 F. Supp. 3d 1247, 1252-53 (D. Utah 2020), which Rederick relies on for his claim that a court has already determined the Utah Post program to produce unreliable dogs. Docket 62 at 13-14.

Dr. Cablk also took issue with the outdatedness of the dog psychology in the Utah Post program, which also made its way into the Highway Patrol's training manual, namely the harshness of the prescribed training methods as evidenced by statements that "the dog should believe it shall obey or die." Docket 56 at 209-210, 213. But Lt. Koltz testified that, although such language remains in the Highway Patrol's manual, the training has since evolved, and such harsh approaches are not taught or utilized in the Highway Patrol's training program. *Id.* at 270-71. Rederick claims that this deviation from the manual is another reason that Rex cannot be reliable. Docket 62 8-9. But to find that a lack of strict adherence to the manual, especially when the training itself was updated in ways that brought it more in line with the recommendations of the defendant's own expert, would be to apply the kind of "inflexible set of evidentiary requirements" that the Supreme Court rejected in *Harris. See* 568 U.S. at 244-45, 248.

Rederick's remaining objection to the magistrate judge's finding that Rex is reliable concerns Rex's written training records, which Rederick describes as "limited, incomplete," and containing "multiple errors." Docket 62 at 7. Specifically, there was "no indication in [the] records who they were reviewed by, several amounts of [hidden] drugs . . . had unknown quantities, [and] dollar

amounts were listed under headings regarding time." *Id.* Trooper Jansen explained that the misplaced dollar signs were the result of inputting data into an Excel form that was formatted to automatically add dollar signs in those fields. Docket 56 at 168-69. Lt. Koltz testified that the blank "reviewed by" fields also resulted from Highway Patrol's process for converting the records into an electronic format, and that he was present at Rex's training and reviewed all the records from that training. *Id.* at 274-75. Finally, Trooper Jansen and Lt. Koltz both explained that references to an unknown quantity refer to when a testing scenario involves an item that was exposed to a drug and "soak[s] up the drug odor," so there is no measurable quantity of drugs in that scenario. *Id.* at 165, 299.

Despite these data entry errors, Trooper Jansen and Rex did complete the 240-hour training program in November 2019, the grade sheet from this program shows that they satisfactorily completed the testing scenarios, and their performance in the training was reviewed by Lt. Koltz. *Id.* at 126-29, 274-75; Docket 52 at 34. Although the defendant put forward an expert to challenge Rex's general reliability, much of her testimony critiqued the Utah Post training model and elements from the Highway Patrol manual that are no longer being used. *See* Docket 56 at 209-210, 213, 219. Weighing all this evidence, the court finds that Rex was reliable, and that Rex's alert, in addition to the other evidence that Rederick was involved in drug trafficking, "would make a reasonably prudent person think that a search would reveal

contraband or evidence of a crime." *Harris*, at 248. Thus, there was probable cause to search the sedan.

### E. Fruit of the Poisonous Tree

Rederick's final objection is that the evidence collected pursuant to search warrants for his house and cell phone should be suppressed as the fruit of an illegal search and seizure of his vehicle. Because the court finds that there was no violation of the Fourth Amendment in the search and seizure of the sedan, the court also finds that the evidence collected pursuant to these warrants should not be suppressed.

### CONCLUSION

The court adopts Magistrate Judge Duffy's Report and Recommendation, granting in part and denying in part Rederick's motion to suppress. Thus, it is

ORDERED that the Report and Recommendation (Docket 55) denying in part and granting in part Rederick's motion to suppress (Docket 42) is adopted in full.

Dated October 13, 2021.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE